1    **WO**

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8

| | |
|---|---|
| United States of America, ) | CR-05-1297-PHX-DGC |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| Mary Ann Harris, Ray Harris ) | |
| ) | |
| Defendants. ) | |
| ) | |
| _____ ) | |

15       Defendants Mary Ann and Ray Harris are charged with concealing a person from

16 arrest in violation of 18 U.S.C. § 1071. They have filed a motion to suppress evidence

17 obtained after an allegedly illegal entry of Ms. Harris' residence. A hearing was held on

18 June 13, 2006, at which several witnesses testified and several documents were admitted into

19 evidence. Defendants' motion requires the Court to determine whether police entry of the

20 residence was justified by exigent circumstances. The facts set forth below are based on the

21 testimony and exhibits presented at the hearing and credibility determinations made by the

22 Court.

23 **I.**     **Facts.**

24       On November 5, 2005, United States deputy marshals and ICE agents were assigned

25 to locate and arrest Francisco Javier Briones-Lopez pursuant to a federal arrest warrant for

26 violation of drug possession and trafficking laws. Briones-Lopez was also the subject of a

27 murder investigation and had been arrested for a weapons charge. Deputies received

28 information that Briones-Lopez might be staying in apartment #2 of building 419 at an

1    apartment complex on West Osborn Road in Phoenix, Arizona.  On the day in question,

2    deputies became aware that Briones-Lopez's vehicle was located at the apartment complex.

3      Deputy Marshal Albert Reble and others set up observation of the suspect's vehicle

4    at approximately 4:00 p.m.  Officers involved in the arrest attempt included deputy marshals,

5    an ICE agent, and an officer from the Arizona Department of Public Safety.  When Briones-

6    Lopez approached his vehicle, the officers moved in to make the arrest.  Upon seeing them,

7    Briones-Lopez fled on foot into the apartment complex.  Deputy Reble gave chase and saw

8    Briones-Lopez run in the back door of apartment #2 in building 429.  When Reble also

9    entered the back door, he saw that the front door was open and concluded that Briones-Lopez

10    had run through the apartment.  Deputy Reble continued his chase out the front door and

11    eventually saw the back door of apartment #2 in building 419 slam shut.  This was the

12    apartment deputies had identified as the location where Briones-Lopez might be staying.

13      Upon conferring with other law enforcement officers who had been engaged in the

14    chase, Deputy Reble learned that one of the officers had seen another individual running

15    Briones-Lopez.  This individual was described as taller and wearing a green shirt.  Deputy

16    Reble also learned that occupants near building 429 had informed officers that the individual

17    who lived in apartment #2 in building 429 had a mother who lived in building 419.  Finally,

18    Deputy Reble learned that officers involved in the chase had found a handgun on the table

19    in apartment #2 of building 429.

20      Deputy Reble knocked on the front door of apartment #2 in building 419.  A woman

21    asked what he wanted.  He stated that he was a deputy marshal and had a warrant for the

22    arrest of the woman's son.[1]  Deputy Reble then heard the woman's voice say, in a somewhat

23    quieter tone, "go out the back."  Fearing that the suspect was about to flee, deputy Reble

24    attempted unsuccessfully to kick in the door.  He could feel it being held closed from the

25    inside.

26

27
28      [1] This statement was incorrect.  Based on comments from the occupants near building 429, Deputy Reble assumed the woman's voice was that of Briones-Lopez's mother. Instead, it was the voice of Defendant Mary Ann Harris, the mother of Defendant Ray Harris.

1    Deputy Reble then heard a man's voice state that he wanted to go out and talk to the
2    officers.  The door opened, and Defendant Ray Harris emerged.  Harris was wearing a green
3    shirt and was identified by another officer as the individual who was seen running with
4    Briones-Lopez.  Harris was restrained for questioning.  Harris admitted that he and Briones-
5    Lopez were friends, but denied that Briones-Lopez was in the apartment.  He claimed that
6    Briones-Lopez had run in a different direction.  When law enforcement officers stated that
7    Briones-Lopez might be armed and dangerous, Harris vomited.  Harris was permitted to re-
8    enter the apartment to change his shirt.  He emerged a few moments later in a clean shirt and
9    remained outside of the apartment for the remainder of the events in question.

10    Defendant Mary Ann Harris also exited the apartment.  She informed the officers that
11    she would not permit them to enter her apartment without a warrant.  She denied that
12    Briones-Lopez was in the apartment, stating that she and another son (her 16 year old son,
13    Charles) were the only individuals in the apartment.

14    By this time, Phoenix police officers had arrived at the scene.  Ms. Harris had placed
15    a 911 call to the police when her apartment was approached by the deputy marshals.  Upon
16    making the call, she was informed that police were already on the way to the location.

17    Deputy Reble concluded that it was best to permit the Phoenix Police Department to
18    take control of the situation.  He and other agents informed the police that Briones-Lopez
19    was in apartment #2 in building 419, that he might be armed, that there was a federal warrant
20    for his arrest on drug charges, and that he was the subject of a murder investigation.  They
21    also informed the police that Mary Ann Harris and at least one other individual were in the
22    apartment.

23    Because it appeared that Briones-Lopez was barricaded in the apartment, Phoenix
24    police called for their SWAT team.  Sergeant Mike Wesley of the SWAT team arrived at the
25    site and was briefed by the deputy marshals.  On the basis of the briefing, Sergeant Wesley
26    concluded that he was dealing with a barricaded suspect, not a hostage situation.  He did not
27    fear for the safety of the apartment occupants.  Deputy Reble likewise did not fear for the
28    safety of the occupants when the police arrived.  During the hearing on June 13, 2006,

1  counsel for the government conceded that no exigency existed at this point.

2          The deputy marshals and police discussed obtaining a search warrant for the

3  apartment and agreed that the warrant should be obtained by the ICE agent responsible for

4  the case. Because the agent was then en route from Yuma to Phoenix, efforts to obtain the

5  warrant were not undertaken immediately. Neither Deputy Reble nor Sergeant Wesley

6  attempted to obtain a search warrant, although both agreed at the hearing that they could have

7  obtained one by telephone in about 30 minutes.

8          More than 20 Phoenix police officers reported to the scene and surrounded the

9  apartment. A negotiator from the police department made telephone contact with Mary Ann

10  Harris, who had re-entered the apartment.[2]  During the course of their conversations, Ms.

11  Harris stated that she would not permit entry into her apartment, that a warrant would have

12  to be obtained, and that she was upset with the deputy marshals. After some conversation,

13  Ms. Harris' boyfriend arrived at the scene. Sergeant Wesley testified that police officers

14  decided to have the boyfriend speak by phone with Ms. Harris. After doing so, the boyfriend

15  reported to police that Ms. Harris had agreed to come out of the apartment.[3]

16          The police set up to receive Ms. Harris and her son when they exited the apartment,

17  but they did not appear. When the police negotiator made phone contact with her again, she

18  said she would talk no further and hung up. She thereafter refused to answer the phone.

19          Sergeant Wesley testified that at this point he became concerned for the safety of Ms.

20  Harris and her son. His concern was based on a change in circumstances – the fact that Ms.

21  Harris had been communicating with police negotiators and had told her boyfriend that she

22  would leave the apartment, but then failed to appear and stopped communicating with police.

23

24          [2] Deputy Reble testified at the hearing that, with hindsight, it was a mistake to permit
25  Mary Ann Harris (and earlier, Ray Harris) to re-enter the apartment when a possibly armed
26  Briones-Lopez was in the apartment.

27          [3] Ms. Harris testified during the hearing that she did not agree to leave the apartment.
28  She provided no testimony, however, about what her boyfriend told police, and the Court
   found Sergeant Wesley's testimony about the boyfriend's report to be credible.

1    Sergeant Wesley was concerned that Briones-Lopez might be restraining Ms. Harris from
2    leaving the apartment and communicating with police. Sergeant Wesley talked to his
3    commanding lieutenant and another sergeant about the change in circumstances and the
4    possibility that the occupants of the apartment might now be in danger. He testified that they
5    decided to err on the side of occupant safety and make entry into the apartment rather than
6    wait for a search warrant.

7        As a result of this decision, police began taking steps to enter the apartment. They
8    fired a series of rubber batons at the front door of the apartment to simulate a knock.
9    Sergeant Wesley heard Ms. Harris yell in response, in an angry tone, but he could not make
10   out her words. Police then attempted to communicate with Ms. Harris using a bull horn,
11   urging her to answer the phone. She again yelled back in response, but Sergeant Wesley
12   could not understand what she said. She did not answer the phone. Police also used the bull
13   horn to tell Briones-Lopez to exit the apartment, without response. The police then shut off
14   electrical power to the apartment. Ms. Harris opened the back door of the apartment, yelled
15   for police to turn the power back on, and closed the door. Police attempted further
16   communications by bull horn, without success.

17       At this point – approximately 30 or 40 minutes after Ms. Harris had failed to exit the
18   apartment and had stopped communications – police entered the apartment. Police breached
19   the front door and Ms. Harris and Charles came out. Ms. Harris said nobody else was in the
20   apartment; Charles disagreed. Because police could not confirm whether any other persons
21   were in the apartment with Briones-Lopez, they entered the front room and set up to clear
22   the rest of the residence. While securing the front room, police found Briones-Lopez hiding
23   under a sofa. The bottom of the sofa had been cut away so a man could lay beneath it. No
24   other occupants were found in the apartment.

25   **II.    Discussion.**

26       As the Supreme Court recently has confirmed, "'searches and seizures inside a home
27   without a warrant are presumptively unreasonable.'" *Brigham City v. Stuart*, 126 S.Ct. 1943,
28   1947 (2006) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). "Nevertheless, because

1  the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant

2  requirement is subject to certain exceptions." *Id*. One of those exceptions is the doctrine of

3  exigent circumstances. A warrant is not required if "'the exigencies of the situation make

4  the needs of law enforcement so compelling that the warrantless search is objectively

5  reasonable under the Fourth Amendment.'" *Id*. (quoting *Mincey v. Arizona*, 437 U.S. 385,

6  393-94 (1978)). The inquiry into exigent circumstances is an objective one. *Id*. at 1948.

7      The Ninth Circuit defines "'exigent circumstances as those circumstances that would

8  cause a reasonable person to believe that entry . . . was necessary to prevent physical harm

9  to the officers or other persons, the destruction of relevant evidence, the escape of the

10  suspect, or some other consequence improperly frustrating legitimate law enforcement

11  concerns.'" *United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004) (quoting *United

12  States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc)) (alteration in original).

13  "'[T]he presence of exigent circumstances necessarily implies that there is insufficient time

14  to obtain a warrant; therefore, the government must show that a warrant could not have been

15  obtained in time.'" *Bailey v. Newland*, 263 F.3d 1022, 1033 (9th Cir. 2001) (quoting *United

16  States v. Tarazon*, 989 F.2d 1045, 1049 (9th Cir. 1993)); *cf. United States v. Alvarez*, 810

17  F.2d 879, 883 (9th Cir. 1987) (requiring the government either to attempt, in good faith, to

18  secure a warrant or to present evidence why a telephone warrant was unavailable or

19  impractical).

20      "Even when exigent circumstances exist, police officers must have probable cause to

21  support a warrantless entry into a home." *United States v. Alaimalo*, 313 F.3d 1188, 1193

22  (9th Cir. 2002). Thus, two requirements must be satisfied: "first, the government must prove

23  that the officer had probable cause to search the house; and second, the government must

24  prove that exigent circumstances justified the warrantless intrusion." *United States v.

25  Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (*en banc*). Officers have probable cause when

26  the totality of the circumstances indicate a "fair probability or substantial chance of criminal

27  activity." *Alaimalo*, 313 F.3d at 1193.

28      The Court concludes that the officers had probable cause to enter Ms. Harris'

apartment. Briones-Lopez had fled from federal law enforcement officers seeking to enforce a federal arrest warrant and had run into Ms. Harris' apartment. After Briones-Lopez had entered the apartment, Deputy Reble heard a woman inside the apartment say "go out the back door." Officers succeeded in surrounding the apartment to prevent an escape, but were refused entry. Ms. Harris denied that Briones-Lopez was in her apartment, and her son, Ray, told law enforcement officers that Briones-Lopez had fled in a different direction, contrary to the observations of pursuing officers. From these facts, the officers had probable cause to believe that Mary Ann and Ray Harris were committing the crime of intentionally harboring Briones-Lopez in the apartment. The totality of the circumstances indicated a "fair probability or substantial chance of criminal activity." *Id.*

The Court also concludes that entry of Ms. Harris' apartment was supported by exigent circumstances. As noted above, concern for the safety of persons other than law enforcement officers can constitute exigent circumstances. *Brooks*, 367 F.3d at 1135. Courts have held that exigent circumstances arise when an officer reasonably believes a person is being held hostage or otherwise is in danger. *See Satchell v. Cardwell*, 653 F.2d 408, 412 (9th Cir. 1981); *Ewolski v. City of Brunswick*, 287 F.3d 492, 502 (6th Cir. 2002); *United States v. Gonzalez-Barrera*, 288 F.Supp.2d 1041 (D.Ariz. 2003); *State v. Hammer*, 759 P.2d 979 (Mont. 1988).

The government does not contend that exigent circumstances existed from the outset of this encounter. Rather, the government contends that exigent circumstances arose when circumstances changed. Several facts support this conclusion: (1) Briones-Lopez fled into the apartment. (2) Briones-Lopez was wanted on a federal warrant, was known to carry weapons, apparently had possessed a weapon in building 429, and was the subject of a murder investigation. (3) After conversing for some time with a police negotiator and then talking with her boyfriend, Ms. Harris informed the boyfriend that she would leave the apartment. (4) Ms. Harris did not leave the apartment and stopped communicating with the police negotiator. (5) Subsequent efforts to get her to leave the apartment or resume communications with police – the batons, bull horn, and power shut-off – were not

1  successful.

2      Viewed objectively, the circumstances in this case did change:  after communicating

3  with officers for some time and eventually agreeing to leave the apartment, Ms. Harris not

4  only failed to leave, but also stopped communicating.  A reasonable officer could conclude

5  from this change that Ms. Harris might now be under the restraint or coercion of an armed

6  and dangerous Briones-Lopez.

7      On the other hand, several facts suggest that an exigency did not exist.  (1) Ms. Harris

8  had exited and re-entered the apartment several times during the afternoon, apparently with

9  no restraint from Briones-Lopez.  (2) Ms. Harris did not appear afraid of any occupant of the

10 apartment.  (3) Ms. Harris consistently refused police entry into the apartment, an attitude

11 that arguably was consistent with her eventual refusal to continue communicating with the

12 police negotiator.  (4) Following her discontinuation of communications with the negotiator,

13 Ms. Harris could be heard yelling from within the apartment, including a point at which she

14 briefly opened the back door and yelled for the power to be turned on again.  One might

15 conclude that this was not the conduct of an individual being held against her will, but the

16 conduct of an individual continuing to defy law enforcement's efforts to enter her apartment

17 without a warrant.  One might also conclude, however, that this conduct was consistent with

18 a person under the coercion of Briones-Lopez.

19     An objectively reasonable officer would be faced with some uncertainty. The changed

20 circumstances would suggest that the occupants of the apartment might be in danger, but the

21 change might also be one more step in Ms. Harris' defiance of law enforcement.  The

22 question that must be answered, then, is whether law enforcement officers facing such

23 uncertainty act unreasonably when they enter an apartment in the interest of occupant safety.

24     Although the Court and counsel have the luxury of quiet deliberation in deciding

25 whether exigent circumstances existed, officers at the scene were confronted with an

26 evolving and potentially dangerous situation.  They knew that a possibly armed murder

27 suspect was barricaded in the apartment and that the conduct of the other occupants had just

28 changed.  The Court cannot conclude that the officers acted in an objectively unreasonable

1   manner when they decided to take action to protect the occupants.  "We evaluate the need

2   of a warrantless entry in view of the totality of the circumstances from the perspective of the

3   police officers at the time of the entry."  *Murdock v. Stout*, 54 F.3d 1437, 1441 (9th Cir.

4   1995).[4]  As the Supreme Court has explained in a slightly different Fourth Amendment

5   context, "[t]he calculus of reasonableness must embody the allowance for the fact that police

6   officers are often forced to make split-second judgments – in circumstances that are tense,

7   uncertain, and rapidly evolving . . . ."  *Graham v. Conner*, 490 U.S. 386, 396-97 (1989)

8   (citations and quotation marks omitted).

9          After the officers had decided to act for the safety of Ms. Harris and others in the

10   apartment, they engaged in various tactics for a period of 30 to 40 minutes before actually

11   entering the premises.  These tactics included firing rubber batons at the front door,

12   attempting to communicate through a bull horn, and shutting off power.  The Court

13   concludes that these were progressive, reasonable steps to secure the exit of the occupants

14   from the apartment and that the time consumed in this steady ramping-up of actions did not

15   eliminate the exigency.  The Ninth Circuit has held that the length of time between the

16   appearance of exigent circumstances and the actual entry of a residence "is not necessarily

17   indicative of the immediacy with which officers acted."  *Ortiz-Sandoval v. Clarke*, 323 F.3d

18   1165, 1171 (9th Cir. 2003); *see also United States v. Standridge*, 810 F.2d 1034, 1037 (11th

19   Cir. 1987) (recognizing that "[e]xigent circumstances do not necessarily involve 'hot pursuit'

20   of a fleeing criminal"); *United States v. McEachin*, 670 F.2d 1139, 1145 (D.C.Cir. 1981)

21   (concluding that delay did not undercut finding of exigent circumstances).

22          Moreover, although it was theoretically possible to obtain a warrant during the 30 or

23   40 minutes that these actions were occurring, the officers were focused on securing the

24   occupants' safety and were acting with reasonable and deliberate efforts to accomplish that

25

26          [4] The *Murdock* case applied a mild exigency analysis that subsequently was rejected
27   by the Supreme Court.  *See LaLonde v. County of Riverside*, 204 F.3d 947, 957-58 (9th Cir.
     2000) (citing *United States v. Ramirez*, 523 U.S. 65 (1998)).  The statement cited in this
28   order, however, is not a part of that analysis.

1    end.  They entered the apartment as soon as those efforts were unsuccessful.  The Court

2    concludes that the officers acted with reasonable speed to secure the safety of Ms. Harris and

3    her son once the exigency arose, and that there was not time, given the safety concerns that

4    had arisen, for the officers to pause in their efforts while a warrant was sought.  *Bailey*, 263

5    F.3d at 1033.

6          In summary, the Court concludes that the officers' entry into the apartment was

7    supported by probable cause and justified by exigent circumstances.  Defendants' motion to

8    suppress will be denied.[5]

9          **IT IS HEREBY ORDERED** that Defendant Mary Ann Harris' Motion to Suppress

10   (Doc. #20) and Defendant Ray Harris' joinder in the motion (Doc. #22) are **denied**.

11         DATED this 21st day of June, 2006.

12

13

14   _____
                       David G. Campbell
                   United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26   _____

27         [5] Because the Court concludes that the entry did not violate the Fourth Amendment,
     it need not decide whether Defendant Ray Harris has standing to assert a Fourth Amendment

28   violation.